IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ADAMS POINTE I, L.P, ADAMS POINTE II, L.P., BAYBERRY NORTH ASSOCIATES L.P., BETTERS REAL ESTATE HOLDINGS, L.P., JBCO; ADAMS POINTE III, L.P. ADAMS POINTE NORTH CONDOMINIUM ASSOCIATION, ADAMS POINTE MASTER ASSOCIATION, L.P., COULTER & GRAHAM, L.P., MICHAEL AND KATHLEEN BICHLER, AND JOHN EVANS, INDIVIDUALLY AND ON BEHALF OF THOSE SIMILARLY SITUATED | § § § § § § § § § § § § § § | Civil Action No.: 2:16-cv-00750-CRE |
| Plaintiffs, | § § | United States Magistrate Judge Cynthia Reed Eddy |
| vs. | § § | |
| TRU-FLEX METAL HOSE CORP., TRU-FLEX, LLC, and PRO-FLEX LLC | § § § | |
| Defendants. | § § | |
| TRU-FLEX METAL HOSE CORP., TRU-FLEX, LLC, and PRO-FLEX LLC | § § § | |
| Third-Party Plaintiffs, | § § | |
| vs. | § § | |
| RIDGE DEVELOPMENT CORP.; RIDGE MANAGEMENT & DEVELOPMENT CORP.; ADAMS POINTE CONSTRUCTION CORP.; ADAMS POINTE SOUTH VILLAGE OWNERS ASSOC., L.P.; ADAMS POINTE CONDOMINIUM ASSOCIATION; WARD MANUFACTURING, LLC d/b/a WARDFLEX; WESBANCO BANK, INC. f/k/a ESB BANK; ELLWOOD INVESTORS, LLC; WEAVER MASTER BUILDERS, INC.; C.J. BETTERS BUILDERS, LLC; BOVARD - ANDERSON COMPANY; CLEARWATER ESTATES CONDOMINIUM ASSOC.; UNIQUE INDUSTRIAL PRODUCT COMPANY; PRO-FLEX HOLDINGS, LLC (OF TEXAS) | § § § § § § § § § § § § § § § § § | |
| Third Party Defendants. | § § § | |

<u>**PLAINTIFFS' FIRST AMENDED COMPLAINT AND CLASS ACTION**</u>

NOW COME Plaintiffs, Adams Pointe I, L.P, Adams Pointe II, L.P., Bayberry North Associates L.P., Betters Real Estate Holdings, L.P, Adams Pointe III, JBCO, Adams Pointe North Condominium Association, Adams Pointe Master Association, L.P., Coulter & Graham, L.L.P., Michael and Kathleen Bichler, and John Evans, Individually and on Behalf of Those Similarly Situated, and hereby submit the following First Amended Complaint against Defendants Tru-Flex Metal Hose Corp., Tru-Flex, LLC, and Pro-Flex, LLC (collectively referred to as "Defendants").

<u>**INTRODUCTION AND BACKGROUND OF CASE**</u>

1.     Tru-Flex Metal Hose Corp., Tru-Flex, LLC, and Pro-Flex, LLC sell a flexible gas piping system throughout the United States, including Pennsylvania, known as Corrugated Stainless Steel Tubing ("CSST") for use in residences and in other structures. CSST consists of continuous, 300-series flexible stainless-steel pipe encased in an insulative outer (yellow) jacket.  The yellow jacket material has the thickness of approximately four sheets of paper.

2.     CSST is marketed as a superior option for natural gas delivery, and Tru-Flex Metal Hose Corp., Tru-Flex, LLC, and Pro-Flex, LLC, claim same to be more installer-friendly and safer than traditional black iron pipe gas delivery systems that have been used by plumbers across the United States for more than 100 years. www.proflexcsst.com.

3.     Despite internal industry recognition and concern that yellow-jacketed CSST products are prone to catastrophic failure when exposed to electrical energy, Tru-Flex Metal Hose Corp., Tru-Flex, LLC, and Pro-Flex, LLC continued the manufacture,

marketing, and distribution of their yellow-jacket CSST product – Pro-Flex® CSST. Indeed, despite knowing that the yellow jacket material encased around the metal tubing transporting natural gas is highly susceptible to disintegration, these Named Defendants marketed and distributed the Pro-Flex® CSST through retail stores to "do-it-yourself" consumers and untrained workers.

4.      According to materials published on a cooperative website maintained by manufacturers of yellow CSST, it is estimated that approximately one billion feet of this piping has been installed in residential, commercial, and industrial structures over the past several decades. www.csstsafety.com/CSST-FAQs.  As manufacturers previously holding the greatest share of the CSST market ceased distribution of the yellow-jacket CSST product to even qualified plumbing professionals, the Named Defendants increased sales of the inherently defective product to consumers.

5.      Tru-Flex Metal Hose Corp., Tru-Flex, LLC, and Pro-Flex, LLC possess actual knowledge that yellow-jacket Pro-Flex® CSST is placed  into the stream of commerce without sufficient thickness to protect against combustion after a lightning strike or potentially even household current. Despite such knowledge, Tru-Flex Metal Hose Corp., Tru-Flex, LLC, and Pro-Flex, LLC continue to manufacture and distribute same to "do-it-yourselfers" and professional installers alike in the Commonwealth of Pennsylvania and nationwide.

6.      The Pro-Flex® CSST product is installed in real property owned by the named Plaintiffs.  Such product has been the cause of property-damaging fires, loss of value to the structures, costs for inspection and repair, retrofitting costs, sales losses due to

the presence of this materially dangerous natural gas pipe through disclosure and/or financing restrictions, and increased risk coverage costs.   Plaintiffs, on behalf of themselves and those similarly situated, seek redress for the harm caused by Defendants in the design, manufacture, and ongoing marketing and sales of a product they know to be defective.

## PARTY IDENTIFICATION AND APPEARANCE

### *Individually Named Plaintiffs*

7.     ADAMS POINTE I, L.P. is a limited partnership created in the Commonwealth of Pennsylvania with its principal place of business at 100 Bet-Tech Drive, Aliquippa, Beaver County, Pennsylvania 15001. The Pointe at Adams Ridge - subdivision I, a residential condominium subdivision, is located in Mars, Butler County, Pennsylvania. ADAMS POINTE I, L.P. is an originally named plaintiff and seeks individual damages.   Furthermore, it intends to seek appointment as a class representative pursuant to the anticipated Motion for Class Certification to be filed in accordance with the Case Management Order.

8.     ADAMS POINTE II, L.P. is a limited partnership created in the Commonwealth of Pennsylvania with its principal place of business at 100 Bet-Tech Drive, Aliquippa, Beaver County, Pennsylvania 15001. The Pointe at Adams Ridge – subdivision II, a residential condominium subdivision, is located in Mars, Butler County, Pennsylvania. ADAMS POINTE II, L.P. is an originally named plaintiff and seeks individual damages.   Furthermore, it intends to seek appointment as a class

representative pursuant to the anticipated Motion for Class Certification to be filed in accordance with the Case Management Order.

9. ADAMS POINTE III, L.P. is a limited partnership created in the Commonwealth of Pennsylvania with its principal place of business at 100 Bet-Tech Drive, Aliquippa, Beaver County, Pennsylvania 15001. The Pointe at Adams Ridge – subdivision III, a residential condominium subdivision, is located in Mars, Butler County, Pennsylvania. ADAMS POINTE III, L.P. was joined as a named plaintiff on April 26, 2017, and seeks individual damages.  Furthermore, it intends to seek appointment as a class representative pursuant to the anticipated Motion for Class Certification to be filed in accordance with the Case Management Order.

10. BAYBERRY NORTH ASSOCIATES, LP is a limited partnership created in the Commonwealth of Pennsylvania with its principal place of business at 100 Bet-Tech Drive, Aliquippa, Beaver County, Pennsylvania 15001.  BAYBERRY NORTH ASSOCIATES, L.P. is an originally named plaintiff and seeks individual damages. Furthermore, it intends to seek appointment as a class representative pursuant to the anticipated Motion for Class Certification to be filed in accordance with the Case Management Order.

11. BETTERS REAL ESTATE HOLDINGS, LLC is a limited partnership created in the Commonwealth of Pennsylvania with its principal place of business at 100 Bet-Tech Drive, Aliquippa, Beaver County, Pennsylvania 15001.  BETTERS

REAL ESTATE HOLDINGS is an originally named plaintiff and seeks individual damages. Furthermore, it intends to seek appointment as a class representative pursuant to the anticipated Motion for Class Certification to be filed in accordance with the Case Management Order.

12.     ADAMS POINTE NORTH CONDOMINIUM ASSOCIATION, L.P. is a limited partnership created in the Commonwealth of Pennsylvania with its principal place of business at 1000 Adams Pointe Blvd., Mars, Butler County, Pennsylvania 15001. The North Condominium Association is the condominium association for the north and central designations at the Pointe at Adams Ridge, a residential condominium subdivision. ADAMS POINTE NORTH CONDOMINIUM ASSOCIATION was joined as a named plaintiff on April 26, 2017, and seeks inclusion in this suit as an individual Plaintiff, and further by official resolution seeks inclusion on behalf of each of the individual owner members of the Association in accordance with its governing documents. The Association also seeks inclusion as a proposed Class Representative regarding its own interests and the interests of its individual member homeowners.

13.     ADAMS POINTE MASTER ASSOCIATION, L.P. is a limited partnership created in the Commonwealth of Pennsylvania with its principal place of business at 100 Bet-Tech Drive, Aliquippa, Beaver County, Pennsylvania 15001. ADAMS POINTE MASTER ASSOCIATION was joined as a named plaintiff on April 26, 2017,

and seeks inclusion in this suit as an individual Plaintiff, and further by official resolution seeks inclusion on behalf of each of the Association members in accordance with its governing documents.   The Association also seeks inclusion as a proposed Class Representative regarding its own interests and the interests of its individual member homeowners.

14.     JBCO, has as its principal place of business 607 Oswego Dr., Gibsonia, Butler County, Pennsylvania 15044.  JBCO owns individual units at the Pointe at Adams Ridge for the primary purpose of leasing same as individual residences, and was joined as a named plaintiff on April 26, 2017. JBCO seeks inclusion in this suit as an individual Plaintiff as to its individual damages, and it intends to seek appointment as a class representative pursuant to the anticipated Motion for Class Certification to be filed in accordance with the Case Management Order.

15.     COULTER & GRAHAM, LLP has its principal place of business at 128 W. Cunningham St., Butler, Pennsylvania 16001.   COULTER & GRAHAM owns individual units at the Pointe at Adams Ridge for the primary purpose of leasing same as individual residences, and was joined as a named plaintiff on April 26, 2017. COULTER & GRAHAM seeks inclusion in this suit as an individual Plaintiff as to its individual damages, and it intends to seek appointment as a class representative pursuant to the anticipated Motion for Class Certification to be filed in accordance with the Case Management Order.

16.     MICHAEL AND KATHLEEN BICHLER are individuals that own their private residence located at 226 Adams Pointe Blvd., Mars, Butler County, Pennsylvania. The BICHLERS were joined as named plaintiffs on April 26, 2017, and they seek recovery for individual damages.   Furthermore, the BICHLERS intend to seek appointment as class representatives pursuant to the anticipated Motion for Class Certification to be filed in accordance with the Case Management Order.

17.     JOHN EVANS is an individual that owns his private residence located at 206 Adams Pointe Blvd., Mars, Butler County, Pennsylvania. EVANS was joined as named plaintiff on April 26, 2017, and he seeks recovery for his individual damages. Furthermore, EVANS intends to seek appointment as class representatives pursuant to the anticipated Motion for Class Certification.

### *Named Defendants*

18.     Defendant TRU-FLEX METAL HOSE CORP.[1] was an Indiana corporation with a principal place of business at 2391 South State Road 263, West Lebanon, IN, and has already appeared and made answer in this suit.

---

[1]     Tru-Flex Metal Hose Corp. was reformed for tax purposes to from Tru-Flex Metal Hose Corp. into Tru-Flex Metal Hose LLC in 2010 as a part of corporate restructuring after acquisition by TGP Investments, Inc.  In 2014, Tru-Flex Metal Hose LLC merged with Tru-Flex, LLC with Tru-Flex LLC as the surviving corporate entity. Defendants Tru-Flex, LLC and Tru-Flex Metal Hose Corp. are herein collectively referred to as "Tru-Flex."

19.     Defendants TRU-FLEX, LLC[2] is an Indiana corporation, and has already appeared and made answer in this suit.

20.     Defendant PRO-FLEX, LLC[3] ("Pro-Flex") is an Indiana corporation, and has already appeared and made answer in this suit.

## JURISDICTION AND VENUE

21.     This is a Class Action lawsuit seeking monetary damages pursuant to Federal Rule of Civil Procedure 23.

22.     This Court has personal jurisdiction over Tru-Flex Metal Hose Corp., Tru-Flex, LLC, and Pro-Flex, LLC because their contacts with the forum are continuous and substantial and because the arise out of Defendants' contact with the forum.

23.     Plaintiffs are citizens of Pennsylvania. Defendants sold and continue to sell the Pro-Flex® CSST yellow-jacket product in Pennsylvania.  Furthermore, real property and residences owned by Plaintiffs in which the Defendants' Pro-Flex® CSST product is installed are located here in the Commonwealth of Pennsylvania.

24.     All Defendants have appeared and answered suit and the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000. Jurisdiction is further conferred

---

[2]     Tru-Flex, LLC was originally formed in 2010 as a part of the corporate restructuring of Tru-Flex Metal Hose Corp. after same was acquired by TGP Investments, Inc.

[3]     Pro-Flex, LLC was originally formed in 2010 as a part of the corporate restructuring of Tru-Flex Metal Hose Corp. after same was acquired by TGP Investments, Inc.

pursuant to the Class Action Fairness Act in that damages exceed more than $5,000,000 in the aggregate, and the parties are citizens of different states. 28 U.S.C. § 1332(d)(2).

26.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because Defendants engage in continuous and systematic activities within Pennsylvania. Moreover, a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District.

## **FACTUAL BACKGROUND**

27.     Although Tru-Flex Metal Hose Corp. began its corporate history in 1962, its manufacturing and distribution of yellow-jacketed CSST did not begin until the 1990's with "Tru-Flex" CSST product. In the early 2000's, Tru-Flex Metal Hose Corp. changed the brand name of its yellow-jacketed CSST product, and began to distribute under the newly-branded Pro-Flex® mark, which was owned by Tru-Flex Metal Hose Corp.

28.     The class action styled *Lovelis, et al. v. Titeflex, et al.*, Case No. Civ-2004-211, Clark County, Arkansas[4] brought the dangers of the yellow-jacketed CSST product to a tipping point, and the CSST industry finally began to internally acknowledge the catastrophic risks posed by the inherent defect in the yellow-jacketed CSST product. Conjunctive with the resolution of the initial class action, the major manufacturers of CSST

---

[4]     The *Lovelis* plaintiffs charged that CSST manufacturers possessed knowledge that yellow-jacket CSST possessed insufficient thickness to protect against combustion, and yet continued to manufacture, market, and distribute same.   The *Lovelis* class action further alleged that the defendants failed to warn consumers about the inherent defect of the CSST product that rendered it unreasonably dangerous when used for its designed purpose.

began to represent that bonding and grounding the CSST system might mitigate the imminent harm posed by electrical imposition on the jacketing material. However, as noted by the Fuel Gas Committee, the validity of bonding and grounding as either a solution or mitigation effort was untested.

29.     Abandoning those consumers whose homes already contained the yellow-jacket CSST product, Defendants continued the sale and marketing of the defective product with installation modifications for the untested bonding and grounding mitigation "correction" to the product.  And although holding out the representation that bonding and grounding might make their dangerous product "safer," the primary manufacturers shifted concentration to the use of safer alternative design of the product that could conduct, rather than focus, electrical current.  The Named Defendants, however, did not.

30.     In 2010, Tru-Flex Metal Hose Corp. was purchased by TGP Investments, Inc.  Corporate restructuring led to name changes, mergers, and the formation of new subsidiary divisions – Pro-Flex, LLC and Tru-Flex LLC.   During and after such restructuring, the manufacturing, distribution, and sale of yellow-jacketed CSST Pro-Flex® continued by Pro-Flex and the Tru-Flex entities.

31.     At all times relevant, the Defendants jointly and collectively manufactured, marketed, sold, and distributed the Pro-Flex® yellow-jacketed CSST, or otherwise placed same into the stream of commerce, which ultimately was installed in Plaintiffs' buildings and residences as well as in millions of homes and buildings across America.

**Product Background - Yellow-Jacketed CSST – Dangerous and Defective.**

32.     Yellow-jacket CSST is uniquely susceptible to degradation and failure when exposed to electrical insult. *See* Mark Goodson and Mark Hergenrether, "*Lightning Induced CSST Fires*" (August 2011), available at www.goodsonengineering.com/wp-content/uploads/2011/08.   The heat of the electrical event penetrates the thin walls of the CSST, even though the electrical arcs last only a fraction of a second. When the piping melts, the gas inside escapes and causes a gas-fueled fire.

33.     "Lightning is a highly destructive force.  Even a nearby lightning strike that does not strike a structure directly can cause systems in the structure to become electrically energized.  This power surge can potentially puncture a hole in CSST and cause a fire." www.csstsafety.com/CSST-FAQs. Electrical energy will travel through any conductive path, such as gas piping, until it is able to reach the ground. Traditional black iron pipes are able to withstand this energy.  Yellow-jacketed CSST cannot.

34.     It has been estimated that the wall thickness of CSST measures approximately .011 inches. The wall thickness, or lack thereof, of the Pro-Flex® CSST is too thin to withstand the electrical energy produced by lightning strikes or even certain household currents unlike its traditional counter-part of black iron pipe.

*Industry Knowledge.*

35.     For the industry, the danger is conceded - yellow CSST "fails in the presence of lightning." SEFTIM, *Final Report for Validation of Installation Methods for CSST Gas*

*Piping to Mitigate Lightning Related Damage*, The Fire Protection Research Foundation (April 2011), www.nfpa.org/assets/files/PDF/Research/CSST.   If a direct or indirect lightning strike energizes CSST, the insulative material will not be able to carry the charge, which will look to jump to a less resistant pathway. Indeed, the minimum amount of energy emitted required to generate the "arc" is the same as one would find in ordinary household electric current and can emanate from household appliances.

36.     Not only does yellow CSST not stop the arcing, it actually helps cause it.  As experts have noted, the yellow CSST actually has no conductive value, meaning it does not distribute the electric charge.  Instead, it serves to focus the energy from an arc into the weakest points of the yellow-jacketing, disintegrating those points first and exposing the metal tubing to further energy, causing holes or perforations in the gas lines.

37.     The CSST industry is aware that inevitably, after installation, CSST is exposed to electric current.  It is frequently exposed during electrical storms and lightning strikes.  But even more frequently, it is exposed in ordinary household circumstances where nearby sources of electricity – electric wiring or appliances – cause a "flashover" or an electric "arc." Despite possessing awareness of the risks posed by yellow CSST when used as expected, Defendants intentionally continued sale of same.

38.     The industry has acknowledged that the mechanism of degradation s any electrical energy source sufficient to cause an "arc" between the CSST and any nearby conductive material which concentrates at a point to puncture or melt a hole in the tubing.

*Alleged Mitigation Through An Ineffective "Fix."*

39.     Originally, the major manufacturers denied allegations that the yellow-jacketed CSST product could not be made safe by proposing to "mitigate" the dangerous propensities of yellow-jacket CSST. This mitigation involved the inclusion of a "bonding and grounding" fix in an effort to *reduce*, not correct or eliminate, the latent defective condition of the CSST product in situations involving one of the identified dangers - indirect lightning strikes.

40.     "Bonding" essentially attempts to connect or tie all metal points in the gas system together so that they conduct at the same electrical potential level, theoretically preventing an "arc" between areas of different electrical potential. The National Electric Code ("NEC") defines *bonding* as, "The permanent joining of metallic parts to form an electrically conductive path that ensures electrical continuity and the capacity to conduct safely any current likely to be imposed."

41.     "Grounding" essentially attempts to provide stray electrical current with a path to the earth (ground).  The NEC defines *grounding* as, "Establishing a connection, whether intentional or accidental, between an electrical circuit or equipment and the earth or to some conducting body that serves in place of the earth." This is accomplished by attaching a larger wire (a ground wire or other ground mechanism) to the tubing to "remove" the electrical charge.  The charge transfers to the ground wire or other "ground" to direct the electric charge away from the tubing.

42.     Without first validating whether the risk of using yellow-jacketed CSST was sufficiently compromised by bonding and grounding future installations, and without regard for any prior legacy installation, bonding and grounding guidelines were included in industry-wide revised Design and Installation Manuals provided to certified installers (not the ultimate homeowner) for purposes of new installations of those defendant manufacturers' yellow-jacket product. Industry regulators almost immediately questioned the purported safety "fix," noting the absence of sufficient validation of the representations of bonding and grounding as a safety solution.

43.     Although representations of a safety mitigation in the form of bonding and grounding arose during the time period of the original class action, and the Standards Council's Task Force began questioning such representations almost immediately, CSST manufacturers did not perform any validation testing of the bonding and grounding "fix" until 2013, _five years_ after launching a campaign to disguise the known dangers of the yellow-jacket CSST product.[5]

44.     Tru-Flex and Pro-Flex joined the presumptive bandwagon of the proponents of the bonding and grounding "mitigation" proposal for future installations.   The Named

---

[5]     Indeed, the methodologies and conclusions asserted in the resultant 2013 Report have been criticized as incomplete, deceptive, and the result of collusion between certain CSST manufacturers, GTI, and other third-party contributors.   Although the CSST manufacturers insinuated a "mitigation" of the inherent danger of CSST on the whole, the testing actually performed _excluded_ all conditions but-for indirect lightning strikes. Furthermore, on October 12, 2015, GTI provided notice to the NFPA Standards Council of revised information in the form of a "2015 Revised Draft Final Report."   The proposed revised report acknowledges the alteration of certain data represented in the original 2013 GTI report.

Defendants included a "bulletin" on their website to purportedly to inform installers of the potential mitigation effect, and in same admitted such potential only existed for indirect lightning circumstances.  And yet, Tru-Flex and Pro-Flex had yet to test the validity of these representations on the Pro-Flex® CSST product.

45.    Despite the concerns voiced by regulators during this time period regarding the lack of validation, some members of the industry continued to market and sell the yellow CSST, including Tru-Flex and Pro-Flex. Other manufacturers, however, began to pursue the available safer designs available for flexible tubing.

***Product Dangers - Pro-Flex® CSST – Ongoing Harm.***

46.    Tru-Flex and Pro-Flex continue to promote the sale of its patented yellow-jacket CSST system, Pro-Flex® CSST, despite both an industry and internal recognition that a safer alternative design is available.

47.    Promotion of the product occurs to not only professionals but also the public at large through sales at retail stores and third-party online locations.  These acts are ongoing despite Defendants' knowledge that Pro-Flex® CSST is not able to withstand electrical charge due to its corrugated design and thin walls. Indeed, in marketing materials related to Pro-Flex® CSST, Tru-Flex and Pro-Flex acknowledge that "electrical arcing is the single most dangerous threat to safety in a lightning scenario."

48.    These Defendants explicitly admit that "[a]rcing can cause damage to CSST." www.proflexcsst.com/docs.   Tru-Flex and Pro-Flex further admit in recent

published materials that "electrical arcing is the single most dangerous threat to safety in a lightning scenario." http://www.structuretech1.com/wp-content/uploads/2015/04/Ship-in-the-fog-flyer.pdf.

49.     Tru-Flex and Pro-Flex modified installation guides to include the "bonding and grounding" instruction for new installations, but did not provide remedies or relief for legacy installations.  Additionally, unlike other manufacturers, Tru-Flex and Pro-Flex opted not to modify the design of its CSST product to one with an arc-resistant jacket, continuing with the use of the insulative yellow jacket and relying solely on the instruction for future installations to include bonding and grounding.

50.     Tru-Flex and Pro-Flex continued to manufacture, market, and distribute yellow jacket Pro-Flex® CSST despite the industry's acceptance of safer alternative designs (for example, black jacket CSST), relying on the possibility of a *mitigation* of *some of the risk* posed by the inherent condition of the Pro-Flex® CSST.

51.     Unfortunately for the ultimate consumer, the "bonding and grounding" recommendation to future installers of the Pro-Flex® CSST product not only fails to remedy the dangerous product as it exists in legal structures, but to those that receive the information it actually compounds the harm by falsely asserting bonding and grounding is sufficient to remedy the inherent dangerous propensities of yellow-jacketed CSST.

52.     Not only does this "fix" as announced for new installations do nothing for legacy installations of Pro-Flex® CSST, it conveniently misses a critical point - the yellow

jacketing material placed on the Pro-Flex® CSST *focuses* the electrical energy onto the surface of the CSST, making bonding and grounding an impotent solution.

53.     Despite claims from Tru-Flex and Pro-Flex that Pro-Flex® CSST is safe(r) when properly bonded, even if all mechanical and electrical systems of the property are properly bonded, yellow Pro-Flex® CSST still poses a risk of a lightning-related fire and risks from even ordinary household current.  Although admittedly aware of these dangers, and the availability of safer alternative designs[6], the Named Defendants not only continue to market and distribute the yellow-jacketed version of CSST, but do so in violation of regulatory obligations for purchase and ultimate installation of the gas-delivery system.

***Product Distribution - Pro-Flex® CSST – Ongoing Harm***

54.     Tru-Flex Metal Hose Corp., Tru-Flex, LLC, and Pro-Flex, LLC have held themselves out to the professional industry, retailers, and individual consumers as the manufacturers of Pro-Flex® CSST.  Indeed, the Pro-Flex® brand name is printed along the yellow-jacket of their marketed CSST product.

55.     Defendants concede that industry practices require CSST to be installed by a qualified plumbing professional and in accordance with the Manufacturer's Design and Installation (D&I) Guide as well as applicable plumbing codes.  For installations that came

---

[6]     Although these Defendants were provided opportunities to manufacture a safer "black jacket" version of CSST, they declined such opportunities in part due to the requirement that manufacturing insight would be voluntarily provided to them upon condition to cease the sale of the dangerous yellow-jacketed product. Indeed, even though the safer design options were available for their own development without the voluntary assistance of other manufacturers, these Defendants continued the delay of manufacturing and distributing the safer product.

after the proposed mitigation "fix" of bonding and grounding, additional bonding of the CSST piping must be performed by licensed electricians since same is electrical, not plumbing, professional work.

56.     The Defendants assert that their Pro-Flex® CSST product is safe enough when installed as directed.  Ultimately, these Defendants take the position that third-parties must assume the role of ensuring the safety of the Pro-Flex® CSST product regardless of the industry-wide admission that the danger is inherent to the yellow-jacketed product. According to these Defendants, their responsibility ends upon the realized sale because third-party entities have assumed the responsibility to meet industry-accepted guidelines.

57.     On the one hand, Tru-Flex and Pro-Flex admit that industry standards require the sale of their product to qualified individuals trained in the plumbing installation of their product.  CSST systems must be installed by qualified installers who are trained in the methods required by that brand's system, and who meet all of the qualifications of the state and local codes and of the authority having jurisdiction where the CSST is installed.

58.     These Defendants, however, simultaneously flout regulations regarding distribution and sale to plumbing professionals trained in the installation of Pro-Flex® CSST by emphasizing retail availability to the public at large. Pro-Flex® CSST is available to do-it-yourself installers at hardware and home supply stores, where the only "training" provided is an installation manual that is often sold separately. The marketing and distribution chain of the Pro-Flex® CSST product includes independent hardware stores,

large "box store" retailers, third-party catalogue sales, and online outlets. In the end analysis, the Defendants absolve themselves from complying with industry practices at the point of distribution to the seller of the product.

59.     According to the Defendants, the down-stream seller assumes the responsibility for ensuring the purchaser of the Pro-Flex® CSST product is not only qualified by appropriate regulations but is further trained in the installation of the Pro-Flex® yellow-jacket CSST.  Additionally, although contrary to both the language and intent of the industry standards, "self-training" is permitted as to Pro-Flex® CSST.  Furthermore, this "self-training" should then result in the personal completion of a certification card, which according to the Defendants, is sufficient to meet any responsibility of the manufacturer as to installation by qualified individuals.

60.     Pro-Flex® CSST is inherently flawed and despite Defendants' insistence that third-parties should be employed to attempt mitigation of the dangers the Defendants created, responsibility remains with these Defendants.

***Representative Plaintiffs' Properties***.

61.     The Plaintiffs own residences affected by the defective Pro-Flex product. Specifically, the Plaintiffs own multiple condominiums, quad duplexes, carriage homes, and townhomes in Pennsylvania for personal possession, leasing, and sale.

Adams Pointe I, II, and III

62.     On June 14, 2015, nearby lightning activity caused a fire at 220 Adams

Pointe Boulevard, Mars, PA.  After a fire investigation by third parties, it was determined

that the Pro-Flex® CSST installed in the condominium unit failed as a result of electrical

insult, releasing natural gas into the unit, which was ignited and caused significant property

damage not only to the contents and structure of the apartment unit with the insulted CSST,

but to neighboring condominium units as well.

 



63.     The structure that experienced the fire had been duly inspected by local code officials prior to the catastrophic failure event.  Upon receipt of the required final inspection report indicating compliance with the Construction Code Act and Uniform Construction Code, building code officials issued the requisite certificate of occupancy for each of the structures owned by Adams Pointe I, II, and III, signifying installation had occurred in accordance with applicable standards and codes.

64.     The fire caused property damage to contents, appliances, and both the interior and exterior condominium structure, and further resulted in third-party expert investigation, repair and replacement of the natural gas piping system. These damages were actual and realized.

65.     Adams Pointe I, II, and III experienced additional harm upon attempts to have residences placed into a sales condition.  Inspectors, becoming aware of the inherent risks of yellow-jacketed CSST, included notation in home inspections of the material defect and danger posed by the product.  Such specific inclusion in home inspections impacted sales and the ultimate value of such residences.

66.     Furthermore, upon noting the presence of yellow CSST, home inspectors included the need to incur additional inspection costs by licensed electrical contractors. Upon realizing the industry knew of the inherent risk of the yellow-jacketed CSST, and had developed a safer alternative design, Adams Pointe I, II, and III began to remediate the imminent harm posed by the previously-installed product.

67.     Adams Pointe I, II, and III began disclosing Pro-Flex® CSST in mandated sellers' disclosures in light of notations by inspectors regarding its presence, and the associated concern that the dangers associated with same might fall under the obligations imposed on sellers to reveal the condition to prospective buyers.

68.     Home sellers must, by law, advise potential buyers about "known material defects" that are not readily observable, including structural and other problems, before the sale is completed. The standard form covers the home's structure, such as the roof, basement, foundation and walls. Buyers also need to know whether the plumbing, electrical, heating and air conditioning systems are in good, working order. Such specific inclusion in sellers' mandated disclosures impact sales and the value of such residences.

69.     Upon realizing the industry knew of the inherent risk of the yellow-jacketed CSST, and had developed a safer alternative design, Adams Pointe I, II, and III began to remediate the imminent harm posed by the previously-installed product in order to address the direct danger to their property from fire as well as to stem the damages connected to the mere presence of the dangerous product in their structures.

70.     Based on information being narrowly distributed by the CSST industry, insurance risk carriers also began to realize the dangers posed by yellow-jacketed CSST. After third-party investigators connected the 2015 fire to the Pro-Flex® CSST installed at Adams Pointe, additional monetary damages were further realized by Adams Pointe I, II, and III in the form of increased risk premium payments.

## Bayberry North and Betters Real Estate

71.     Bayberry North and Betters Real Estate experienced actual harm and damages from the installation of yellow-jacketed CSST.  Bayberry North and Betters Real Estate own residential properties with yellow-jacket CSST installed, and once made aware of the imminent danger lurking in the material condition of such product, these Named Plaintiffs began mitigating the risk by removing the dangerous yellow-jacketed version and replacing same with the safer design offered by black-jacketed CSST.  Such efforts resulted in actual monetary losses by these Named Plaintiffs.

72.     Additionally, during the course of a residential sale, Bayberry North and Betters Real Estate were made aware that the allegations and disclosures of yellow-jacketed CSST as a material defect affected the safety of the property, and therefore, the financing available for sales.  Specifically, third-party financing for a pending sale was denied based upon such material danger.

73.     Bayberry North and Betters Real Estate are currently realizing damages in the form of diminution in value from the effect of seller disclosures of yellow-jacket CSST on sales and seller-associated costs, and damages incurred from failures connected to the loss of third-party financing for property sales.

## JBCO and Coulter & Graham

74.     JBCO and Coulter & Graham own residential properties located within the Adams Pointe community, and these residential properties contain Pro-Flex® CSST, which

is considered a defect material to the safety of the property.  A material defect is a problem that cannot be corrected with simple maintenance – it is something that will require significant effort to repair.  Pro-Flex® CSST falls into such category, which affects the value of the owned structures.  JBCO and Coulter & Graham must incur the monetary damages associated with remediating the imminent harm, while currently experiencing the loss of value in their property.

75.    The residences owned by JBCO and Coulter & Graham were duly inspected by local code officials.  Upon receipt of the required final inspection report indicating compliance with the Construction Code Act and Uniform Construction Code, building code officials issued the requisite certificate of occupancy for each of the completed units owned by JBCO and Coulter & Graham signifying installation had occurred in accordance with applicable standards and codes.

76.    Experts in electrical and mechanical failure analysis with extensive experience in the dangers of CSST propose the following: (1) convert structures to electricity only and remove all gas delivery systems; (2) retain gas delivery systems but remove all Pro-Flex® CSST from the structures and install black iron pipe; (3) remove all Pro-Flex® CSST from the structures and install gas delivery systems that do not possess the insulative yellow jacket; or (4) incur costs to install modified gas breaker valves to trigger the shut-off of natural gas to the CSST system in the event of electrical insult.

Adams Pointe North Condominium Association and
Adams Pointe Master Association

77.     As associations for a common interest community, the Adams Pointe North Condominium Association and Adams Pointe Master Association are directly and actually damaged by the inherently dangerous condition of Pro-Flex® CSST.

78.     Condominiums in Pennsylvania are governed by the Uniform Condominium Act, 68 Pa. Stat. §§ 3101 to 3414 (the "UCA"). Although "condominium" is a term generally used to refer to an individually-owned unit, it is also a form of ownership involving property other than the individual residence is deemed to be common property. Adams Pointe North Condominium Association and Adams Pointe Master Association were created to pursuant to the UCA requirements to manage the common affairs of the condominium owners in the Adams Pointe Central and Adams Pointe North residential areas.

79.     Each of the structures and facilities available for use at Adams Pointe Central and Adams Pointe North duly received the requisite certificates required prior to the use or occupation of these buildings.  Such certificate is provided only after appropriate building code officials receive a final inspection report indicating compliance with the Construction Code Act and Uniform Construction Code, and further signifying installation had occurred in accordance with applicable standards and codes.

80.     At Adams Pointe, individual owners are responsible for everything "inside" of their units, and damages sustained by an owner to the interior of the residence, such as

damage to any fixtures, walls, or flooring, is the responsibility of the owner to remedy. However, damages experienced to the exterior of the unit fall under the Associations as does any damage to common buildings.

81.    After the 2015 fire, these Associations were financially accountable for exterior repairs and renovations, and realized actual damages connected to same. Additionally, the Associations incurred increased risk premiums, which comprises additional monetary damages further realized by Adams Pointe North Condominium Association and Adams Pointe Master Association.

82.    Furthermore, because of the obligations of the Associations regarding disclosure of important facts about common interest property at sale to a buyer, and requirements of resale disclosures for any sale after the initial sale by the developer of the property, inclusive of a buyer's rescission rights in a sale contract, the Associations are cognizant of the need to continue incurring actual damages in the form of remediation of common buildings in order to mitigate against the imminent harm posed by the presence of the Pro-Flex® CSST product at Adams Pointe and the overall effect of the presence of Pro-Flex® CSST within Adams Pointe buildings.

<u>Bichler and Evans</u>

83.    The Bichlers and John Evans are individuals that hold the deed for their current residences.  These residential properties contain Pro-Flex® CSST, and as noted above, same is considered a defect material to the safety of the property, which involves a defect that is considered to require significant effort to repair.  These individuals have

incurred actual damages in the form of third-party inspection costs to identify the scope of the danger as well as incur the monetary damages associated with remediating the imminent harm, while currently experiencing the loss of value in their property.

84.     The residences owned by the Bichlers and Evans were duly inspected by local code officials.   Upon receipt of the required final inspection report indicating compliance with the Construction Code Act and Uniform Construction Code, building code officials issued the requisite certificate of occupancy for each of their residences indicating installation in accordance with applicable standards and codes.

85.     These homeowners possess limited options to mitigate the impending harm posed by the dangerous yellow-jacketed CSST product, all of which force these individual consumers to shoulder the expenses of a product known to the Defendants to be inherently dangerous while being used for its designated purpose. These options are costly to individual property owners since same require either conversion of their homes to remove all gas delivery systems; retain gas delivery systems but remove all Pro-Flex® CSST from the structures, and instead install gas delivery systems that do not possess the insulative yellow jacket; or incur costs to install modified gas breaker valves to trigger the shut-off of natural gas to the CSST piping system in the event of electrical insult.

## CLASS ALLEGATIONS

86.     Plaintiffs bring this cause of action individually and on behalf all other similarly situated persons, pursuant to Federal Rule of Civil Procedure 23.

87.    Plaintiffs anticipate defining this Class as any and all persons and/or entities who:

> ***Own real property in the United States in which yellow-jacket Pro-Flex® CSST manufactured, designed, marketed, or distributed by the named Defendants was installed.***

It is further anticipated that additional sub-class definitions may be necessary upon class certification.

88.    The following persons and/or entities are excluded from the Class:

   a)    Persons and/or entities who timely opt-out of this proceeding using the correct protocol for opting-out that will be formally established by this Court;

   b)    Persons and/or entities who have settled or otherwise resolved claims against the Defendants arising out of or in connection with individual fire damages alleged to be caused by Pro-Flex® CSST, to the extent of the resolution of those claims;

   c)    Any and all federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and

   d)    Any currently sitting Pennsylvania state court judge and/or justice in the current style and/or any persons within the third degree of consanguinity to such judge and/or justice.

89.    In the event that the Court should determine not to certify a nationwide Class, then in the alternative, Plaintiffs seek certification of a Pennsylvania-only class.

90.    Plaintiffs reserve the right to modify the class definition with greater specificity or division during the certification process and associated deadlines.

91.   _Numerosity – Rule 23(a)(1)._ Plaintiffs do not know the exact size or identities of the members of the proposed Class but such information should be in the available as under the control of the Defendants. However, upon information and belief regarding the installation of yellow-jacketed CSST in millions of homes, the class likely encompasses hundreds of thousands of consumers.[7]

92.   The yellow-jacketed Pro-Flex® CSST product is sold by direct distributors, individual hardware stores, "big box" retailers, catalogue retailers, and through online outlet sales throughout the United States.  As a result, joinder of persons is impracticable. While the precise number of class members are unknown at this time, the number can be clarified through ongoing discovery both of the Defendants and non-parties.

93.   The disposition of Plaintiffs' claims will provide a substantial benefit in using Rule 23 as the vehicle to adjudicate the rights of thousands of individuals and/or entities in one cause of action. Joining and naming each potential Class Member as a co-plaintiff is unreasonable and impracticable.

94.   _Predominance and Commonality – Rule 23(a)(2); (b)(3)._ As to the Class, there are common questions of law and fact which predominate over any questions affecting individual Class Members which include, but are not limited to:

    (a)   Whether Pro-Flex® CSST is uniformly manufactured with an insulative jacket;

---

[7]   Such is well in excess of the 100-plaintiff CAFA minimum for jurisdiction, and supports the Rule 23(a) numerosity requirement.

(b)     Whether Pro-Flex® CSST's yellow-jacket coating is susceptible to perforation after exposed to electrical insult equal to an indirect lightning strike;

(c)     Whether Pro-Flex® CSST's yellow-jacket coating is susceptible to perforation after exposed to electrical insult equal to a direct lightning strike;

(d)     Whether Pro-Flex® CSST's yellow-jacket coating is susceptible to perforation after exposed to electrical insult equal to ordinary household current;

(e)     Whether Defendants tested or validated the "bonding and grounding" proposed "fix" on its own product - Pro-Flex® CSST – prior to representing bonding and grounding mitigated the dangers of their product;

(f)     Whether bonding and grounding renders Pro-Flex® CSST safe for its intended use;

(g)     Whether the Plaintiffs' use of Pro-Flex® CSST in residential structures was foreseeable;

(h)     Whether the Defendants possessed an awareness that the manufactured condition of Pro-Flex® CSST posed a danger to consumers;

(i)     Whether a safer alternative design was available to the Defendants;

(j)     Whether Defendants comply with the letter and intent of industry standards and practices regarding sales to and installations by qualified installers trained in the installation of Pro-Flex® CSST;

(k)     Whether Defendants can distribute the cost of compensating for injuries and/or damages resulting from defects by charging for it in the market place;

(l)     Whether Pro-Flex® CSST was inspected and reached the user and/or consumer without substantial alteration in the condition that the product was designed, manufactured, marketed, sold, and/or distributed;

(m)     Whether Defendants failed to adequately warn consumers that Pro-Flex® CSST was defective and/or unreasonably dangerous at the time it left Defendants' control;

(n)     Whether the imposition of strict liability upon Defendants serves as an incentive to properly design, manufacture, market, and/or distribute safe products;

(o)     Whether restitution is an appropriate remedy for the Plaintiffs and Class Members;

(p)     Whether remediation and removal of the Pro-Flex® CSST is the appropriate remedy to Plaintiffs and Class Members;

(q)     Whether Plaintiffs and Class Members are entitled to inspection and the installation of potential safety devices such as gas breaker valves at the cost of the Defendants;

(r)     Whether Class Members are entitled to monetary damages for Defendants' wrongful conduct; and

(s)     Whether Class Members are entitled to an injunction requiring Defendants to cease and desist from selling, marketing, distributing, and/or placing into the stream of commerce yellow-jacketed Pro-Flex® CSST.

95.     Furthermore, there are common questions of law and fact based in the same core evidence for all members such as: (1) the timeline of available knowledge regarding the dangers of yellow jacket CSST; (2) sales and training on installation of Pro-Flex® CSST; (3) the inherent nature of the defect; (4) the scope of the named Defendants' participation in the campaign of "safety" in bonding and grounding; (5) Tru-Flex and Pro-Flex's testing and validation of the bonding and grounding "fix"; (6) the effect of bonding and grounding on indirect lightning, direct lightning, and household current insults to the Pro-Flex® CSST; (7) the availability of safer designs; and (8) the causal link between the deceptive, intentional and/or reckless acts of the Defendants and the damages.

96.     These common questions of law and fact exist as to all members of the Classes and predominate over questions that could affect only individual class members.

97.     *Typicality – Rule 23(a)(3)*. The claims asserted by Plaintiffs are typical of the claims of the Class.  Each of the Plaintiffs and the proposed Class Members are persons or legal entities who have Pro-Flex® CSST installed in their home or building. Defendants were aware that Pro-Flex® CSST is unreasonably dangerous, and are further aware that the campaign of bonding and grounding does nothing to ameliorate such danger.  Each Plaintiff and member of the Class is therefore bringing a claim based upon the core evidence and facts outlined *supra* regarding the sale and installation of Pro-Flex® CSST despite its known defects and the ineffective but costly "fix" of bonding and grounding. Again, to the extent necessary, sub-classes can be defined within the proposed class definition.

98.     *Adequacy of Representation – Rule 23(a)(4).* Named Plaintiffs will fairly and adequately represent the claims of the Class members because Named Plaintiffs have an interest in seeing their claims through to resolution, which will at the same time resolve the claims of the class-members.  The Plaintiffs are comprised of consumers of Pro-Flex® CSST, and have suffered the categories of injury alleged in this cause.

99.     The Named Plaintiffs include individuals, businesses, and associations that own both property intended for personal residence purposes as well as for purposes of lease and business use.

100.   Plaintiffs are represented by competent counsel who have extensive experience in class action and consumer advocacy generally, and further who have extensive and specific experience with claims regarding yellow CSST gas distribution systems, the individually named Defendants, and other CSST lawsuits. Such counsel can bear the cost of prosecuting the class action to conclusion.   None of the Plaintiffs is antagonistic with the Class or has an interest in conflict with the Class.

101.   *Superiority – Rule 23(b)(3)*. This Class Action is not only the appropriate method for the fair and efficient adjudication of the controversy, but is, in fact, the superior method to all other available causes of action for the following reasons:

a)   The joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b)   This product liability action requires expert involvement and expenses that can overshadow individual claims, and the class members will lack the resources to undergo the burden and expense of individual prosecution of complex matters;

c)   Individualized litigation increases the delay and expense as to all parties and multiplies the burden on the judicial system presented by the complex legal issues;

d)   When Defendants' liability has been adjudicated, claims of all Class Members can be determined by the court and administered efficiently in a manner which is far less erroneous, burdensome, and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

e)   This Class Action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of class claims to promote economies of time, resources, and limited pool of recovery;

f)   This Class Action will assure uniformity of decisions in litigation;

g)     Without the Class Action, Class Members will go without restitution, remediation or money damages;

h)     Without this Class Action, the restitution and/or remediation damages will be borne by the Class members and Defendants will reap the benefits of profits from defectively designed, manufactured, marketed, and/or distributed products;

i)     The resolution of this controversy through this Class Action presents fewer management difficulties than individual claims filed in which the parties may be subject to varying adjudications of their rights;

j)     Injunctive relief will be available to protect all consumers from the sale, marketing, and/or distribution of unreasonably dangerous products.

102.    Furthermore, a class action is a superior mechanism in this case pursuant to Federal Rule of Civil Procedure 23(b)(2) because Tru-Flex and Pro-Flex have acted in a way that is consistent as to all Plaintiffs and Class Members as to the Pro-Flex® CSST product,  and thus injunctive relief would apply to the Class as a whole.

## FRAUDULENT CONCEALMENT - DISCOVERY RULE - AFFIRMATIVE REPRESENTATIONS

103.    Tru-Flex and Pro-Flex had a duty to disclose to Plaintiffs the internal industry knowledge of the defect of Pro-Flex® CSST, and the inaccuracies of supposed validation of any safety fix in bonding and grounding. Tru-Flex and Pro-Flex further had a duty to warn consumers such as the Plaintiffs of the susceptibility of Pro-Flex® CSST to disintegration or degradation after electrical insult.  And yet, the Defendants remained silent as to a product that is inherently dangerous such that it constitutes a material defect.

104.    Tru-Flex and Pro-Flex actively and fraudulently concealed that Pro-Flex® CSST is unreasonably dangerous, unfit for its ordinary and/or intended use, and/or is

unsafe. Instead, to the contrary, these Defendants actively held the Pro-Flex® CSST out as safe for its intended use in residential and business structures.

105.    Furthermore, the ongoing violation of industry standards and practices regarding the distribution, sale, and training requirements for installation constitutes affirmative acts that should operate to prevent division of responsibility to any third-party for failures inherent to the product itself.

106.    Defendants' fraudulent concealment and overt misrepresentations of the safety of Pro-Flex® CSST or the existence of a "safety fix" tolls the running of any applicable statute of limitations. Plaintiffs could not have, with the exercise of real caution, prudence, or diligence, discovered the defect within the applicable statute of limitations, thus tolling same.

## MISCELLANEOUS

107.    Any conditions preceding the institution of this lawsuit have been performed, have occurred, and/or have been waived.

108.    By filing the lawsuit, Plaintiffs neither intend to, nor in fact do, waive or release any right, claim, action, cause of action, defense and/or election of remedy.

## CAUSES OF ACTION

109.    According to Tru-Flex and Pro-Flex, Pro-Flex® CSST is a superior piping system that can supply natural gas throughout a home or commercial building, and suggests routing it through walls, floor or ceiling joists, or outside to a variety of appliances. These ongoing representations not only ignore the underlying danger of the yellow-jacketed

product regardless of installation or inspection, but further ignores the existence of industry-wide recognized safer alternative designs to the flexible tubing natural gas system.

110.    Although the industry was developing potentially safer alternative "black" CSST products for 2004 public release, the Defendants opted not to engage in any safety modification to the manufacturing specifications of the Pro-Flex® CSST product.  Instead, as other manufacturers left the "yellow jacket" market behind, these Defendants saw the shift to a safer alternative as an opportunity to increase their own sales.

111.    Both the National Association of State Fire Marshals (NASFM) and the lightning experts at the Lightning Protection Institute (LPI) acknowledge, and support, the safer black-jacked flexible tubing natural gas system based upon the higher electrical arcing qualities of such product.  Despite such positioning, the Defendants continue the manufacture and marketing of the unreasonably dangerous yellow-jacket product.

112.    The harm in continuing sales of an admittedly defective product is amplified as to the Pro-Flex® CSST product since same is marketed and sold to the do-it-yourself market and subject to what Defendants classify as "self-training" on the installation of a natural gas system.  Defendants consider qualifications and training to be the responsibility of either the consumer or independent third-parties, and the resultant violation of industry standards prevents property owners from understanding the full scope of the danger posed by the Pro-Flex® CSST product.

113.    Furthermore, to the extent that any attention is given to the danger of yellow-jacket CSST, Defendants focused their efforts on future installations, leaving consumers with legacy installations in the dark regarding the dangers of the Pro-Flex® CSST product.

114.    Plaintiffs hereby incorporate by reference the allegations contained in paragraphs 1-6, 28-86, and 110-114 of this First Amended Complaint as if set forth herein verbatim, and upon same assert the following causes of action and requests for relief:

**COUNT I**

**Breach of Implied Warranty of Merchantability and Fitness**
**(By all Named Plaintiffs and on Behalf of a Nationwide Putative Class)**

115.    This cause is asserted against all of the Defendants and on behalf of all of the Named Plaintiffs and proposed putative national class.

116.    The Defendants establish the component design and development pursuant to their manufacturing specifications, assume the role of manufacturer as to the final CSST product, hold themselves out to the public and certification bodies as the manufacturer of their product, and are accountable for the condition of their product when they place same into the market for sale.

117.    Pro-Flex® CSST was sold and then installed in Plaintiffs' premises and/or dwellings in the same material condition as when it left Defendants' control and such use of the Pro-Flex® CSST product was foreseeable.

118.    The Uniform Commercial Code[8] §2-314 recognizes that "a warranty that the goods shall be merchantable is implied in a contract for sale if the seller is a merchant with respect to goods of that kind." Therefore, implied in the sale of Pro-Flex® CSST to

---

[8]    The Uniform Commercial Code has been adopted by every state with the exception of Louisiana.  To the extent Louisiana differs from the UCC, if in any relevant part pertinent to this action, a Louisiana sub-class may be appropriate.  Such allegations will be made in the context of the appropriate motion for class certification.

Plaintiffs and the Class is the warranty that the purchased product is legal, safe, and can lawfully be sold and possessed.

119.    Furthermore, where a seller has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to furnish suitable goods, there is an implied warranty that the goods shall be fit for such purpose. *Id.* at § 2-315.

120.    The Tru-Flex entities and Pro-Flex market the Pro-Flex® CSST for the specific purpose of installing same in structures as the natural gas distribution system. These Defendants further explicitly encourage the purchase of their yellow-jacketed Pro-Flex® CSST product for the purpose of carrying natural gas.  However, the inherent danger created by the yellow-jacket surrounding the Pro-Flex® CSST is such that the very system intended to safely transport natural gas is ultimately the greatest danger.

121.    The Plaintiffs and Class Members are reasonable consumers, and no reasonable consumer willingly constructs, uses, or owns a structure that inherently contains an imminent risk of catastrophic loss, and yet due to the actions of the Defendants, the Plaintiffs and putative Class Members are forced to either suffer devastating losses, endure the imminent danger, or incur independent costs to remediate against same.

122.    Indeed, no reasonable consumer would knowingly purchase a product that is defective, dangerous, or improper for the purpose for which it is marketed and sold.  Nor would any reasonable consumer agree to the installation of a product whose mere presence in a structure requires disclosure of same as a material defect for purposes of sale and

valuation, or otherwise results in inspectors of legacy installations to specifically note the necessity for additional, expert inspection and repair.

123.    Tru-Flex and Pro-Flex have long been aware that household electric current emanating from inside a house can cause the same damage and destruction as an indirect lightning strike in light of the composition of the yellow jacket surrounding Pro-Flex® CSST, and that such product is unfit for the ordinary purpose of gas distribution as intended in light of the inherent dangerous defect.  Certainly, Pro-Flex® CSST fails when insulted by lightning: upon electrical contact with the CSST, same operates to focus the electrical energy through the yellow-jacket and into the tubing itself, thus causing the electricity to perforate the natural gas pipe and permit gas to escape.

124.    Even with code-compliant and manufacturer-recommended bonding, which is required to be separately paid for by the consumer in an attempt to address the dangerous condition, Pro-Flex® CSST is not immune to electrical insult.

125.    Plaintiffs and the Class Members have realized damages in the amounts paid for repair, replacement, remediation, property loss, inspection, and losses connected to the disclosure of the yellow-jacketed Pro-Flex® CSST gas piping systems by home inspectors and/or as a part of required sellers' disclosures[9] of a material defect as well as the cost effect on the insurability of such structures through loss of coverage and/or increased risk

---

[9]    All states, including the Commonwealth of Pennsylvania, require some form of Seller's Disclosure of hazards or environmental contaminants on the property, as well as report if there are any title, insurance, or financial issues.  All states further include broad-form disclosure of material defects that may not be expressly listed on the statutory or industry forms, where sellers are expected to disclose anything that did not otherwise fit the categories on the form.

premiums. These damages are direct and indirect results of the Defendants' breach of these

implied warranties for which the Plaintiffs and Class Members deserve recovery.

## COUNT II

### Strict Products Liability
**(By all Named Plaintiffs and on Behalf of a Nationwide Putative Class)**

126.    This cause is asserted against all of the Defendants and on behalf of all of the

Named Plaintiffs and the proposed putative national class.

127.    At  all  times  relevant  to  this  cause  of  action,  Defendants  jointly  and

collectively were manufacturers, distributers, and/or entities that placed a defective product

into  the  stream  of  commerce.  The  Pro-Flex®  CSST  product  was  supplied  by  these

Defendants  in  a  defective  condition  that  rendered  it  unreasonably  dangerous,  and  the

defective condition was the proximate cause of pleaded injury, harm, and damages.

128.    As ordinary consumers, Plaintiffs and Class Members did not expect the

product to possess a condition that upon normal use was dangerous beyond their reasonable

contemplation.  Furthermore, these ordinary consumers did not, and could not, appreciate

the probability and seriousness of the harm inherent to the yellow-jacketed product at issue.

129.    Section 402A of the Restatement (Second) of Torts provides that (1) one who

sells any product in a defective condition unreasonably dangerous to the user or consumer

or to his property is subject to liability for physical harm thereby caused to the ultimate

user or consumer, or to his property, if (a) the seller is engaged in the business of selling

such a product, and (b) it is expected to and does reach the user or consumer without

substantial change in the condition in which it is sold.  Under section 402A, the seller of a

product that is in a defective condition unreasonably dangerous to the ultimate user or consumer will be liable to that user or consumer.

130.    Tru-Flex and Pro-Flex owed a duty to manufacture, market, sell, distribute, and/or place into the stream of commerce products that were not unreasonably dangerous to consumers. The  Defendants  breached such duties by not only continuing the sale of yellow Pro-Flex® CSST without independently testing same as to the represented "fix" of bonding and grounding, but also despite knowledge of the insufficiency of  "warnings" purportedly issued by a third-party safety campaign.

131.    The Defendants further breached these duties in the decision to ignore legacy installations of Pro-Flex® CSST. Although acknowledging the dangerous flaw of their product internally by the Defendants, owners of residences and business structures containing the yellow Pro-Flex® CSST as installed prior to the proposed "mitigation" of bonding and grounding were left to fend for themselves both as to warning and remedy.

132.    The non-delegable duty articulated by the Restatement is imposed on persons or entities to make and/or market its product—which "is expected to and does reach the user or consumer without substantial change in the condition in which it is sold"—free from "a defective condition unreasonably dangerous to the consumer or the consumer's property. Pro-Flex® CSST manufactured by Tru-Flex and Pro-Flex was expected to, and did, reach Plaintiffs and Class Members' structures without substantial change in the condition in which it was manufactured, tested, inspected, distributed, marketed or sold.

133.    Even more egregious in this matter is the admission that despite awareness of safer alternative designs that were financially competitive with the dangerous yellow-

jacketed product, these Defendants continued the manufacture and distribution of yellow Pro-Flex® CSST.

134.    The above-described acts and omissions resulted in harm to Plaintiffs and class members, who are experiencing realized damages in the form of property loss, structural damage, expended inspection and repair costs, measurable loss of value connected with this product as a material defect, and increased insurability costs. Plaintiffs and class members have further incurred specific remediation costs as to those structures that have already undergone safety remediation and replacement to remove the dangerous Pro-Flex® CSST product in light of the ongoing imminent harm of catastrophic loss.

## COUNT III

### Negligence - Marketing Defect/Failure to Warn
### (By all Named Plaintiffs and on Behalf of a Nationwide Putative Class)

135.    This cause is asserted against all of the Defendants and on behalf of all of the Named Plaintiffs.

136.    Tru-Flex and Pro-Flex failed to adequately notify the end user consumers, such as the Plaintiffs, of the unobvious danger inherent in Pro-Flex® CSST.

137.    Tru-Flex and Pro-Flex knew or reasonably should have known of the dangers that inherently existed in their Pro-Flex® CSST product. Tru-Flex and Pro-Flex had a duty to not only warn consumers of their product, but further independently test and validate the asserted safety of same. Defendants breached this duty by failing to warn consumers both before and after the sale and/or installation of the products in question.

138.   Tru-Flex and Pro-Flex intentionally attempted to distract consumers from the dangers posed by legacy installation through the "safety campaign" that actually encouraged the continued use of the product, but with suggestion for the consumer to incur separate costs for additional inspections.   Although the campaign was of little use in reaching ultimate structure owners regarding potential mitigation by third-parties who could attempt to make the Defendants' product safer, the Defendants participation in such campaign is telling – Defendants have long been aware of the danger inherent in the yellow Pro-Flex® CSST product.

139.   Tru-Flex and Pro-Flex possessed a long-running awareness that energy buildup from electric energy generated by household current, indirect lightning strikes, or lighting strikes could disintegrate or melt the yellow jacketing, thus exposing the metal tubing underneath.   Once exposed, arcing between the metal tubing and nearby metal charged objects causes holes in the tubing, in turn leading to gas leaks, fires or explosions. And yet sales continued.

140.   Tru-Flex and Pro-Flex were negligent and breached their duty of care by negligently failing to give adequate warnings to purchasers and users of Pro-Flex® CSST, including Plaintiffs, about the unreasonably dangerous and defective condition of Pro-Flex® CSST, the likelihood of CSST-induced fires, and the substantial and unreasonable risk of death or personal injury yellow-jacketed Pro-Flex® creates.

141.   Despite the fact that Defendants knew or reasonably should have known that Pro-Flex® CSST was associated with and/or could cause natural-gas fed fires, thus creating

a substantial and unreasonable risk of death or personal injury, they continued to market, manufacture, distribute and sell Pro-Flex® CSST to do-it-yourselfers and without confirmation of qualifications or training of installers are required by industry practices and standards. The result of such acts and omissions is that consumers such as the Plaintiffs and Class Members now own structures that contain a serious risk of fire or explosion.

142.   Tru-Flex and Pro-Flex failed to exercise reasonable care in the design, marketing, and sales of Pro-Flex®, and further failed to inform Plaintiffs and the Class of the dangers inherent associated with using Pro-Flex® in their structures, and thus failed to adequately warn of its dangers.  Such negligence and failure to warn caused actualized property loss and attendant damages.

143.   The cost of removing or remediating Pro-Flex® CSST is prohibitive to many structure owners, and the act of shifting the costs safety measures is the very type of market failure and economic harm consumer protection laws was designed to prevent.  Plaintiffs and the class members are left with few options in addition to absorbing realized property losses -- accept the danger, the increased insurability risk, associated loss in value stemming from material defect disclosures, and loss of sales opportunities due to impeded third-party financing, or undertake personal costly measures to remove the danger inherent to the yellow Pro-Flex® CSST product.

144.   As a direct and proximate result of the conduct alleged above, Plaintiffs and Class members have suffered ascertainable losses of money or property, real or personal, in the diminution of the value of their property since same is unsafe as

compared to safer alternatives, in incurring ineffective extraneous costs for inspection, bonding and grounding, in removal and remediation costs, and increased premiums to account for the higher-risk insurability of the structures.

## COUNT IV

### Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law
### (By Plaintiffs and on Behalf of the Pennsylvania Subclass)

145.    This cause is asserted against all of the Defendants and on behalf of all of the Named Plaintiffs as well as the proposed Pennsylvania putative sub-class.

146.    Plaintiffs and the proposed Class members are "person[s]" as that term is defined by 73 P.S. § 201-2(2), Pennsylvania's Unfair Trade Practices and Consumer Protection Law. "Person" means natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities. Plaintiffs and the proposed Class members purchased goods from Tru-Flex and Pro-Flex for personal, family, or household purposes in residential natural gas distribution.

147.    Defendants conducted acts of unfair methods of competition, and acted unfairly and deceptively in the manufacture, marketing, sale, and distribution of the Pro-Flex® CSST product.    Defendants failed to disclose information available to them concerning the inherent dangers of Pro-Flex® CSST, and actively engaged in a campaign advocating supposed safety through the "bonding and grounding" fix.    Furthermore, Defendants continue to manufacture, market, and sell a product known to be defective when used for its specific purpose, and engaged in unfair or deceptive acts prohibited by the Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq*.

148.    Tru-Flex and Pro-Flex's conduct and omissions alleged herein occurred throughout the Commonwealth of Pennsylvania, and constitutes deceptive conduct that creates a likelihood of confusion or misunderstanding in connection with the usefulness, quality, safety and desirability of Pro-Flex® CSST.  The conduct and omissions alleged herein violated Pennsylvania's Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-2(4), including but not limited to:

(i)     Passing off goods or services as those of another;

(ii)    Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services;

(iii)   Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another;

*** 

(v)     Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;

*** 

(vii)   Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;

*** 

(ix)    Advertising goods or services with intent not to sell them as advertised;

*** 

(xxi)   Engaging in any other fraudulent or deceptive conduct which creates likelihood of confusion or of misunderstanding.

149.    These unfair or deceptive acts or practices were likely to, and did in fact, deceive reasonable consumers, including Plaintiffs and the Pennsylvania sub-class members.

150.    Plaintiffs and these putative subclass members seek to recover those damages authorized by the Pennsylvania Unfair Trade Practices and Consumer Protection Law, § 201-9.2. These Plaintiffs and the proposed Class have suffered harm in the form of actualized property damages, monetary losses from the inspection, removal, and remediation of the CSST product, and monetary losses arising from adjustments to the insurability of their structures.  Therefore, they seek to recover actual damages; that the award be increased up to three times the actual damages sustained; and, for such additional relief as is necessary or proper, including but not limited to costs and attorney fees.

## COUNT V

### Injunctive Relief
**(By all Named Plaintiffs and on Behalf of a Nationwide Putative Class)**

151.    Plaintiffs seek injunctive relief to enjoin the CSST Defendants from further selling, marketing, distributing, and/or placing the yellow-jacketed Pro-Flex® CSST in the stream of commerce without making it safe for its ordinary and/or intended purposes by:

a)      Appropriately and properly insulating Pro-Flex® CSST; and

b)      Warning all consumers, including direct notification of homeowners as well as distributers and/or installers, regarding the dangers of yellow-jacketed Pro-Flex® CSST, even if bonded and grounded, when exposed to electrical current so that consumers may make an informed decision regarding the risk-utility involved.

## RELIEF REQUESTED

152.    Plaintiffs Adams Pointe I, L.P, Adams Pointe II, L.P., Bayberry North Associates L.P., Betters Real Estate Holdings, L.P, Adams Pointe III, JBCO, Adams Pointe North Condominium Association, Adams Pointe Master Association, L.P., Coulter & Graham, L.L.P., Michael and Kathleen Bichler, and John Evans, Individually and as Class representatives on behalf of all similarly situated persons and/or entities respectfully request that the Court grant the following relief and/or enter judgment against the named Defendants, jointly and severally as follows:

a)    Certify this cause of action as a class action pursuant to Rule 23 and appoint Plaintiffs as Class representatives and Plaintiffs' counsel as Class counsel;

b)    Order that Defendants pay for notice to be sent to all class members;

c)    Find that the named Defendants are jointly and severally liable for Plaintiffs' and Class Member's injuries and economic losses;

d)    Award appropriate monetary damages to Plaintiffs and the proposed Class in an amount equal to losses from fire to real and personal property;

e)    Award appropriate monetary damages to Plaintiffs and the proposed Class in an amount equal to the amount to remove the defective product and install safely designed gas pipes;

f)    Alternatively, or in further conjunction with the above damages, award an amount equal to expert inspection costs and installation of additional safety features, including but not limited to items such as gas breaker valves;

g)    Alternatively, or in further conjunction with the above damages, award an amount equal to the loss or diminution in value of a structure in which the product is installed;

h)   Alternatively, or in further conjunction with the above damages, award appropriate monetary damages equal to the risk coverage costs and premiums imposed by third party carriers due to the presence of CSST product;

i)   Award such equitable relief permitted, including an injunction requiring Defendants to notify all Class Members that they are entitled to submit an additional or supplemental request for payment in connection with prior loss and/or damage to their structures and/or premises;

j)   Order Defendants to engage in accurate, corrective educational advertising;

g)   Award pre-judgment interest to prevent Defendants from receiving unjust enrichment from their improper conduct;

h)   Award reasonable and necessary attorneys' fees and costs to Class counsel; and

i)   Award such other and further relief in law or in or equity as the Court determines fair, reasonable, appropriate, and/or just deems just.

Respectfully submitted,
CARPENTER & SCHUMACHER, P.C.


*/s/Rebecca Bell-Stanton*
N. SCOTT CARPENTER (*pro hac vice*)
REBECCA BELL-STANTON (Pa. Bar No. 323555)
Parkway Centre IV
2701 N. Dallas Parkway, Suite 570
Plano, Texas 75093
Telephone: 972-403-1133
Facsimile: 972-403-0311
Email:  scarpenter@cstriallaw.com
             rstanton@cstriallaw.com


ROBERT PEIRCE & ASSOCIATES, P.C.

*/s/ D. Aaron Rihn*
D. AARON RIHN, ESQUIRE (Pa. Bar No. 85752)
707 Grant Street
Pittsburgh, PA 15219
Telephone: (866) 273-1941
Facsimile: (412) 281-4229
Email: arihn@peircelaw.com


MEDURE BONNER BELLISSIMO PEIRCE & DALEY

*/s/ Jason Medure*
JASON MEDURE (Pa. Bar No. 90976)
JOSEPH S. BELLISSIMO (Pa. Bar No. 70897)
22 North Mill Street
New Castle, PA 16101
Telephone: (724) 653-7855
Facsimile: (724) 202-7918
Email: jmedure@medurebonnerlaw.com
             jsblaw@prodigy.net


*ATTORNEYS FOR PLAINTIFFS*